FILED
U.S. DISTRICT COURT
AUGUSTA DIV.
2017 MAY 30  A 9:59
CLERK C. Adey
SO. DIST. OF GA.

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA

------------------------------------------------------------------------X

KATHERINE FRINK-HAMLETT, INDIVIDUALLY
AND AS ADMINISTRATOR OF THE ESTATE OF TIMOTHY
AKIL HAMLETT, (deceased), *PRO SE*
1033 Wilson Avenue
Teaneck, NJ 07666

CV117-063

      Plaintiff,

JURY TRIAL

  __Yes  __NO

v.

BRADFORD HEALTH SERVICES
105 Rossmore Place
Augusta, GA 30909

      Defendant.

------------------------------------------------------------------------X

## COMPLAINT

  Plaintiff, Katherine Frink-Hamlett, individually and as Administrator of the Estate of Timothy Akil Hamlett, deceased, appearing *pro se*, demands judgment against Defendant, Bradford Health Services for compensatory damages commensurate with the Estate's losses.

### AVERMENTS OF JURISDICTION

  1. Plaintiff, Katherine Frink-Hamlett, is an adult individual acting in the capacity as Administrator of the Estate of Timothy Akil Hamlett. Plaintiff resides at the above-captioned address.

  2. Defendant, Bradford Health Services (hereinafter referred to as "Bradford") is a drug rehabilitation center, licensed and authorized to conduct and transact business within the State of Georgia, with an office for service located at the above-captioned address.

1

3. This is an action arising under 28 U.S.C. §1332 entitled "Diversity of Citizenship" pursuant to the diversity of citizenship between the parties, and due to damages being in excess of $75,000.

4. Venue is proper in the Southern District of Georgia because all of the material events took place in the Southern District of Georgia.

## GENERAL AVERMENTS

6. Plaintiff, Katherine Frink-Hamlett, incorporates by reference hereto, all of the averments contained in Paragraphs 1 through 5 inclusive, as if set forth at length herein.

7. On October 13, 2016, letters of administration on the estate of Timothy Akil Hamlett (hereinafter referred to as "Hamlett"), deceased, were issued by the Bergen County Surrogate's Court of the State of New Jersey.

8. A negligence/wrongful death action is being made by Plaintiff against Defendant.

9. In August of 2012, Hamlett began his college career as a freshman with UPENN.

10. Prior to his freshman year at UPENN, beginning in his Junior year of high school and continuing throughout the senior year, Hamlett was systemically recruited for the UPENN's Track & Field team by then Coach Martin.

11. Hamlett was specifically recruited for the 400m team.

12. The recruitment process was systemic and intense and included the following:

   a. Routine telephone calls and texts from Coach Martin to the main house telephone number and directly to Hamlett on his cell phone.
   b. Ongoing communication between Coach Martin and Hamlett's parents.
   c. An invitation to an on-campus Varsity Track & Field open house which was attended by Hamlett and his parents.

2

      d. Instruction and guidance on strategies to raise Hamlett's math SAT score to meet UPENN's API index. Specifically, when retaking the SAT exam, Coach Martin advised that Hamlett focus only on the Math section as UPENN would super score (take the best scores from each exam) to determine the final overall SAT score.

      e. An on-campus, three-day athletic visit with the Varsity Track & Field team (no parents included or invited).

      f. Coach Martin attended at least one (if not more) of Hamlett's high school Varsity Track & Field events.

      g. When advised that Columbia University had extended an offer for Hamlett to join their Varsity Track & Field team, Coach Martin replied, "Tim's a UPENN man!"

13. The development of the special relationship between UPENN's Athletic Department, generally, and Coach Martin, specifically, continued when Hamlett arrived on campus as follows:

      a. On or around August 12, 2012, on Hamlett's first day on campus and prior to the start of classes, upon information and belief, Coach Martin came to the Hamlett's dorm room and had Hamlett join the other members of the Varsity Track & Field team.

      b. Introductory emails from Coach Martin were addressed to new team members and they were affectionately referred to as the "Men of Penn"

      c. When finalizing his freshman, first semester schedule, the only course that Hamlett did not get was a freshman seminar that coincided with the evening Varsity Track & Field practice schedule even though, upon information and belief, the class was not closed and had availability. Upon information and belief, Coach Martin blocked Hamlett's access to the class because of the schedule conflict.

      d. Coach Martin routinely sent emails to Hamlett containing positive quotes for inspiration and perseverance.

      e. Coach Martin traveled extensively with Hamlett during an aggressive schedule of indoor and outdoor Varsity Track & Field events.

      f. Coach Martin routinely communicated with Hamlett regarding practice schedules and was frequently at practice.

3

    g. Upon information and belief, at the beginning of Hamlett's sophomore year, Coach Martin moved Hamlett from his recruited team, the 400m to the 800m team, without Hamlett's request or consent.
        i. This transition was done even though Hamlett was on academic probation at the time.
        ii. This transition was done even though the 800m event is a much more rigorous event requiring more practice time which would decrease the amount of study time for Hamlett, who, at the time was on academic probation.
    h. Upon information and belief, at the beginning of Hamlett's sophomore year, Coach Martin selected Hamlett to host one of the Track & Field recruits for the 800m team. Hosting included having the Recruit stay in Hamlett's dorm room with Hamlett accompanying the Recruit to various events.
    i. During this time, Hamlett has conveyed to his parents his reluctance to accommodate the Recruit but did so in any event in light of the request made by Coach Martin, his commitment to Coach Martin and the Varsity Track & Field team.
    j. Upon information and belief, in order to effectuate a successful transition to the 800m team, Coach Martin and/or other members of UPENN's Athletic Department introduced Hamlett to a wide variety of so-called athletic supplements including cordyceps, caffeine and male enhancement pills.
    k. Upon information and belief, Hamlett's sophomore year, Coach Martin created a separate "study hall" for Hamlett on Tuesdays and Thursdays afternoons where he was provided a designated desk in the Track Office and required to attend.
    l. Upon information and belief, this personalized study hall session created by Coach Martin was not optional and indeed, was required for Hamlett to participate as a member of the Varsity Track & Field team.

14. On or around September 13, 2014, an individual advised Coach Martin that, among other things, Hamlett had attempted suicide. The individual advised that they had

witnessed Hamlett on more than one occasion entering a secluded area with a belt and hearing gurgling noises.

15.     On or around September 13, 2014, Coach Martin called Katherine Frink-Hamlett and advised that, among other things, Hamlett had been removed from the Varsity Track & Field team and that an individual had advised that, among other things, Hamlett had been smoking "a fair amount of weed"

16.     During that same phone call Coach Martin called stated that this individual was "crying" during the call yet never informed Katherine Frink-Hamlett of the suicide attempts.

17.     At no point did Coach Martin inform Katherine Frink-Hamlett of the suicide attempts reported by the individual.

18.     Upon information and belief, at no point did Coach Martin inform any other members of UPENN's Athletic Department of the suicide attempts reported.

19.     Upon information and belief, at no point did Coach Martin inform the office of Counseling and Psychiatric Services (CAPS) of the suicide attempts reported.

20.     Even though in January 2014, another member of the Track & Field team had completed suicide, upon information and belief, at no point did Coach Martin communicate Hamlett's suicide attempts.

21.     Upon information and belief, at no point did Coach Martin reach out to Hamlett to discuss the reported suicide attempts.

22.     On or around, September 14, 2014, and based upon the call from Coach Martin, the parents of Hamlett traveled from New Jersey, their state of residence, to Pennsylvania to meet with Hamlett and check on his well being.

23. Despite assurances from Hamlett that he was fine and doing well, the parents of Hamlett made the decision to have Hamlett take a leave of absence from UPENN to address the marijuana concerns as conveyed by Coach Martin.

24. During the period of on or around September 14, 2014 through September 17, 2014, the parents of Hamlett rented a nearby hotel room to effectuate a leave of absence for their son.

25. On or around September 15, 2014 and September 16, 2014, Hamlett and his parents met with CAPS.

   a. Upon information and belief, at no time did CAPS conduct a thorough psychological evaluation of their son.

   b. Based upon, among other things, the statement made by Coach Martin regarding Hamlett's use of marijuana, the parents of Hamlett sought guidance on in-patient drug rehabilitation facilities.

   c. CAPS recommended Behavioral Health of the Palm Beaches (BHOP) as an inpatient drug rehabilitation provider.

   d. Hamlett's parents had suggested another facility and CAPS recommended that the particular facility not be considered.

   d. CAPS was at all times aware that Hamlett was a member of the Varsity Track & Field team and that a prior suicide of a teammate has occurred earlier in January 2014.

26. On or around September 19, 2014, Hamlett was admitted to BHOP for in-patient drug rehabilitation care.

27. Prior to Hamlett's admission, Katherine Frink-Hamlett spoke with Coach Martin to advise that Hamlett had taken a leave of absence. Again, Coach Martin never once conveyed any information regarding Hamlett's suicide attempts.

28. Upon information and belief, medical records both prior to and after Hamlett's admission to BHOP revealed the use of marijuana only.

29. Upon information and belief, medical records both prior to and after Hamlett's admission to BHOP revealed that no other drugs were present in Hamlett's system.

30. Upon information and belief, Hamlett was the only patient in BHOP admitted for marijuana use. Most other patients were admitted for heroin, prescription pain killers and the like.

31. From September 19, 2014 through approximately December 20, 2014, Hamlett was in a combination of supervised in-patient and outpatient drug rehabilitation care.

32. During this period, approximately for several weeks in November of 2014 through December of 2014, Hamlett became a patient of Bradford. Specifically, Hamlett participated in an out-patient drug rehabilitation program which meet for approximately two hours daily, five days a week.

33. During this period, a physician-patient relationship was established between Bradford and Hamlett.

34. Upon information and belief, Hamlett was no longer using marijuana.

35. Upon information and belief, Hamlett's medical records had disclosed prior use of marijuana.

36. Upon information and belief, Hamlett's medical records disclosed the use of no other drug, including alcohol.

37. Upon information and belief, Hamlett was the only patient who had a prior use of marijuana.

38. Upon information and belief, testing conducted by Bradford on Hamlett revealed the use of no drugs or alcohol whatsoever.

39. Upon information and belief, Bradford's patients consisted of people addicted to heroin, prescription drugs and the like.

40. Upon information and belief, Hamlett was placed with the adult group rather than the adolescent group.

41. During this period, Hamlett's parents took him to the daily sessions at Bradford.

42. During this period, various administrators stated that Hamlett was frequently unable to sit in the sessions for extended periods and would leave, remaining in the Bradford facility, then return.

43. During this period, Hamlett's father repeatedly requested that Hamlett be moved from the adult group to the adolescent group for treatment among people who were closer to his age. Bradford refused the request.

44. During this period, Hamlett and Hamlett's parents met with one of Bradford's representatives who held herself out as a licensed psychiatrist. She stated that she thought Hamlett might be bi-polar and wrote out a prescription medicine for this condition.

45. Hamlett's mother asked how she knew if Hamlett was bi-polar and whether any testing had been conducted to reach this medical conclusion, the psychiatrist responded that she did know if he was bi-polar, that no testing had been done and she was essentially speculating.

46. Hamlett's mother, in response, questioned the proprietary of issuing medication based on no testing and what was essentially and admittedly, speculation. The psychiatrist's response is that we just "throw medicine" at the problem to see if it works.

47.     Upon information and belief, many of these medicines cause suicidal ideation, particularly among young adolescents, aged 18-25. Hamlett was 20 during his treatment at Bradford.

48.     Upon information and belief, Bradford is not equipped to treat bi-polar patients or other mental disorders.

49.     Based on the administrator's observations of Hamlett's behavior, the psychiatrist's speculation and the fact that Hamlett was not using drugs and had not been using drugs for several weeks if not months, Bradford should have recommended a transfer to a facility equipped to treat mental disorders.

50.     Bradford was more interested in receiving continued payments for Hamlett's participation in their program than they were in providing Hamlett with the treatment is required for his own health and well-being.

51.     At all times material hereto, Defendant acted or failed to act by and through her agents, servants, workmen and/or employees who were then and there acting within the scope of their authority and course of their employment with Defendant.

52.     Defendant, owed Hamlett, a duty to possess and exercise that degree of professional skill, care, and knowledge ordinarily possessed and exercised by and/or required of drug rehabilitation facilities.

53. By failing to recommend or otherwise secure greater psychiatric medical care for Hamlett upon their own observations and the fact that Hamlett was not and had not been using drugs, Bradford caused Hamlett to receive improper medical treatment that led to the exacerbation and deterioration of his medical/mental condition.

54. By failing to recommend or otherwise secure greater psychiatric medical care for Hamlett upon their own observations and the fact that Hamlett was not and had not been using drugs, Bradford caused Hamlett to suffer extraordinary pain, anguish and mental instability which denied him the opportunity to obtain the mental health care he desperately needed for his survival.

55. During a brief six-day period, when Hamlett was at home in NJ for the holiday break he went missing on December 26, 2014.

56. On May 29, 2015, the remains of Hamlett were recovered from the Hudson River.

57. Upon information and belief and based upon the report issued by the New York State Medical Examiner, Hamlett died by suicide.

58. Bradford's failure to recommend or otherwise secure greater psychiatric medical care for Hamlett constitutes gross negligence which resulted in Hamlett receiving improper treatment for his mental condition and is the proximate cause of Hamlett's death by suicide.

## COUNT I
## NEGLIGENCE

59. Plaintiff, incorporates by reference hereto, all of the allegations contained in paragraphs 1-58, as if they were set forth at length herein.

60. The negligence and carelessness of the Defendant, acting as aforesaid, consisted of the following: Bradford failing to recommend and/or otherwise secure greater psychiatric medical care for Hamlett notwithstanding their own observations and the fact that Hamlett was not and had not been using drugs,.

61. As a result of Defendant's acts, Hamlett suffered serious injuries as a result of the continued deterioration of his mental condition and his ultimate death.

10

62. As a result of Defendant's acts, Hamlett's promising life was cut short and he never realized his earning capacity or had the opportunity to further his athletic career.

**WHEREFORE,** Plaintiff, Katherine Frink-Hamlett, demands judgment against the Defendant for compensatory damages commensurate with Hamlett's.

## COUNT II
## WRONGFUL DEATH

63. Plaintiff, Katherine Frink-Hamlett, incorporate by reference hereto, all of the allegations contained in paragraphs 1-58, as if they were set forth at length herein.

64. The negligence and carelessness of the Defendant, acting as aforesaid, consisted of the following: Braford failing to recommend and/or otherwise secure greater psychiatric medical care for Hamlett notwithstanding their own observations and the fact that Hamlett was not and had not been using drugs,.

65. As a result of Defendant's acts, Hamlett suffered serious injuries as a result of the continued deterioration of his mental condition and his ultimate death which was of a violent and terrifying nature.

66. As a result of Defendant's acts, Hamlett's promising life was cut short and he never realized his earning capacity or had the opportunity to further his athletic career.

**WHEREFORE,** Plaintiff, Katherine Frink-Hamlett, demands judgment against the Defendant, jointly and/or severally, for compensatory damages commensurate with Hamlett's losses.

                                            Katherine Frink-Hamlett, Administrator, Pro Se

                                            */s/ Katherine Frink-Hamlett*

                                            Katherine Frink-Hamlett

Dated: May 27, 2017